# SENTENCING ALTERNATIVES

**PRE-SENTENCE MEMORANDUM**

Submitted in regard to

**UNITED STATES OF AMERICA**

-v-

**HARBIR PARMAR**
Case No. 18-cr-877 (VB)

Before the Honorable Vincent L. Briccetti
United States District Court
Southern District of New York

Attorney of Record:     Arthur L. Aidala, Esq.

Prepared by:     Chris Napierala, Director

Court Date: June 24, 2019

Table of Contents

I.      Introduction                                          1

II.     Psychosocial History                                  2

        A.  Family Composition                                2

        B.  Birth through Middle School                       3

        C.  High School, College                              5

        D.  Offense Period through Instant Arrest             7

        E.  Post-Arrest Conduct and Circumstances             9

   III. Recommendation                                       11

Exhibits

# I.    Introduction

On March 11, 2019, Harbir Parmar pled guilty to one count of Kidnapping (18 USC § 1201) and one count of Wire Fraud (18 USC §1343), in full satisfaction of indictment 18 CR 877. Sentencing Alternatives submits this Memorandum on behalf of Mr. Parmar, at the request of defense counsel, Arthur L. Aidala.

Mr. Parmar accepts full responsibility for his crimes. Nothing in this memorandum should be construed as an attempt to diminish or divert from that conduct or the need for commensurate punishment, consistent with the full range of sentencing factors and objective defined in 18 USC § 3553(a). Information contained herein is based on interviews with Mr. Parmar and multiple collateral sources, and a review of multiple printed and electronic documents. These are listed in Exhibit A.

Our investigation confirmed Mr. Parmar's account of his conduct history and the offenses. Based on our findings, Sentencing Alternatives respectfully recommends a non-custodial sentence. We do so with full knowledge of the offense conduct, the gravity and impact of such offenses generally, and the purposes and goals set forth in § 3553(a). Several factors warrant community supervision:

- **Remorse**
  Mr. Harbir has expressed what we believe to be sincere remorse regarding the harm that he has caused the victims, the shame that he has brought his family, and the fear that such offenses bring to prospective car-service passengers. Collateral sources who have discussed the offense with him universally stated that he has expressed remorse in his conversations with them.

- **Conduct History and Character**
  Mr. Harbir has no history of criminal convictions. By all accounts, he has been consistently hard-working, generous and peaceable, deeply committed to his family and to building a stable, responsible adulthood. Since he began to work in high school, Mr. Harbir set aside part of his income to help his parents pay household expenses. He graduated from college and has an excellent work history. We are unaware of any previous pattern of criminal or reckless conduct that might indicate a threat to public safety or a likelihood of reoffense. Mr. Parmar has extensive and durable community ties, a stable residence, an impressive work record, and a history of formal and informal charitable works. The appended character letters, from persons who have known him in various settings throughout his life, reference these observations, as do the interviews included herein.

- **Context of Offense**
  Based on our investigation, we believe that Mr. Harbir's actions derived in part from the intense emotional and psychological stress that he experienced during the offense period, primarily due to the deep debt he had incurred--roughly $50,000--through the purchase and renovation of a house. He became increasingly ashamed and deeply depressed--this is a

general observation, not a clinical assessment--and acted in the hope that he could resolve it himself without further reliance on his father. Persons familiar with his circumstances at the time cited the duress that he appeared to be under. It does not appear that he committed these offense to enrich himself.

We do not contend that this excuses Mr. Parmar's conduct. This is simply the context in which the occurred--highly stressful conditions that eventually resulted in desperate acts. In our conversations, he blamed no one but himself, and he did not jump to these issues to justify his actions. Indeed, he did not raise them until we posed relevant questions.

- **Post-Arrest Conduct**
  Mr. Harbir has consistently attended monthly appointments with Pretrial Services. It is our understanding that his toxicologies have all been negative. He also attends weekly individual mental-health counseling at First Light. Mr. Parmar stated that he has not been prescribed medication, but that the therapist told him, "You catastrophize things…take these family burdens onto yourself…like I make it all my responsibility."

- **Existing Punishments**
  Regardless of the sentence, the instant conviction will have two significant long-term impacts on Mr. Harbir and his family. First, his criminal record, particularly given the conviction charges, will significantly limit his employment options. The Business Management Degree that he obtained, paid for almost entirely out of his pocket, will likely be for naught since few employers who run a background check and see his record will likely hire him. Second, the extensive media coverage has brought the Harbir family great scrutiny and, particularly significant in their Sikh community: shame. Reporters camped outside of the family home for days and harangued neighbors. The story appeared prominently in local and national media, and social media. As we describe below, the bad acts of one family member are traditionally considered a negative reflection on the family as a whole, and the Parmars have already avoided many family functions for this reason. His mother in particular has been profoundly affected.

Collateral sources universally reported that Mr. Harbir appears to be deeply depressed and has significantly withdrawn from his friends and relatives. He is devastated by the shame that he has brought his family, humiliated by his actions and their consequences.

We further address these factors in Section III, Sentencing Considerations.

## II. Psychosocial History

### A. Family Composition

Harbir Parmar was born on October 17, 1993, in Panshta, India, to Sukhwinder Kaur (mother) and Kirpal Singh (father), and is the eldest of their three children. Mr. Parmar's siblings are: Gagan Parmar (sister), age 19, a student at Baruch College, and Satveer Parmar (brother), age 17, a senior at Leon Goldstein High School in Brooklyn. Excepting a brief stint as a home-health aide,

Ms. Kaur has been a housewife since Mr. Parmar's birth. Mr. Singh has driven a yellow cab since 1988. The family resides at 149-37 83rd Street in Howard Beach, New York, which Mr. Singh purchased in 2000.

Mr. Parmar has no children and has never been married. He and his father stated that no family member has a history of substance abuse or diagnosed mental illness, nor has a criminal history. All family members are United States citizens.

## B.    Birth through Middle School

Mr. Singh stated that Mr. Parmar was born full term and physically healthy, and remained healthy during early childhood. At the time, Mr. Singh resided in a rental in Richmond Hill, Queens, and worked six to seven days per week as a taxi driver. He sent remittance to his family and Ms. Kaur, who resided with them in Panshta, a rural village in Punjab province surrounded by farms. Mr. Singh largely supported the family, including aunts, uncles, and a brother stricken with polio, and still does.

Mr. Parmar recalled said that although Panshta was fairly poor--little employment, minimal medical care, electrical outages--he had a stable and happy upbringing among a large extended family and a tight-knit community. Based on reports from Ms. Kaur and his family, Mr. Singh stated that Mr. Parmar was social, bright and well-adjusted. Mr. Parmar said that he got on well in the equivalent of preschool, attended Sikh nightly religious services with the family, and from a young age helped them serve meals to the community and clean the temple. He described his mother as attentive and responsible, "always had a smile on her face...trying to keep me happy...I always did what I was supposed to do, always listened, always respected my elders." Until his immigration here at age four-and-a-half, Mr. Parmar knew his father only through photographs. "A lot of people had respect for him and talked nice about him, so I looked up to him as well," Mr. Parmar recalled.

In 1998, Ms. Kaur and Mr. Parmar joined Mr. Singh in Richmond Hill. Mr. Parmar recalled an initially difficult transition due to the language barrier--he did not speak English--and the "culture shock" of life in New York City. He spent little time outside due to crime in the neighborhood and had few friends due to the language barrier; thus, he spent most of his non-school time at home, watching television and playing video games. Although his father was mostly at work during the week, they spent time together on weekends, including temple, and the house was often filled with visitors. Mr. Parmer said that his mother tried to teach him rudimentary English, but he had a hard time of it and greatly missed his relatives and village life.

Mr. Parmar attended kindergarten through grade two at PS 108. Report cards from that period confirm that he struggled academically--there were no English-as-a-Second-Language classes--but got along well with classmates and was considered "kind" and cooperative. Mr. Parmar said that he "stayed quiet" until his English became more proficient. His father recalled positive parent-teacher conferences, "never any complaints."

In 2000, around the time Mr. Parmar finished second grade, his father purchased the current residence in Howard Beach, and the family moved there. His sister was born that year, his brother two years later. Reports cards from PS 232 confirm that Mr. Parmar's grades significantly improved, and he became an Honor Roll student. He said that within a couple years, "I was always raising my hand...helping [classmates]." Mr. Parmar also joined the Kids Who Care Committee, a community-service program that planted trees and ran fundraisers for the school and community. Indicative of teacher comments from this period: "It has been such a pleasure to be Harry's teacher. He works so hard to complete each and every assignment." (He provided Honor Roll and Perfect Attendance certificates.)

At the Sikh Cultural Society, where his family has been active since his childhood, he began to volunteer handing out napkins for meals, and eventually helping to prepare and serve food.

Mr. Parmar said that outside of harassment after the September 11 terrorist attacks and bullying about "not having the nicest clothes or sneakers...but I was happy with what I had," he was increasingly comfortable and happy socially. Joseph Fischetti stated. "I grew up across street. They were always a modest family, and he was always good. Sociable, kind...Barbecues, block parties...always over to each other's houses. Honestly, there's just nothing negative he did that I can think of."

In 2004, Mr. Parmar graduated to MS 202, where he was placed in advanced classes. School records confirm that he made Honor Roll and National Junior Honor Society every year, and was "Attentive in class." His father said that Mr. Parmar was consistently well-behaved at home, helped his younger siblings with their homework, and did not exhibit adolescent rebellion. "Nobody ever complained about Harbir," he stated, "[not] the neighbors, his teachers--nobody." Outside of a brief stint boxing, Mr. Parmar mostly played video games and listened to music at home, socialized among a small group of friends, and spent time with family. "I was expected to focus on studies, and I did, especially by eighth grade," he recalled. "I didn't have [conflict with my parents]. I noticed that lot of kids in the park were getting in trouble, so I focused on my studies."

In 2007, Mr. Parmar graduated to Thomas A. Edison Career and Technical High School in Jamaica, Queens.

## C.     High School, College

Little changed over the next four years. His Edison transcript confirms that although his grades dropped, Mr. Parmar kept an 85 cumulative average. He earned a student-of-the-month award. Because of the 90-minute commute each way and the more-difficult coursework, his daily routine typically consisted of school, the return home, homework, and sleep. He recalled, "I didn't have time to play on teams or anything like that. No drama, no girlfriends…I just wanted to do the best I could because I was one of first to be in college here in America. Completing college was my goal. I was always a computer geek…helped people fix their computer problems, PC tuning and repairs.

Junior year, Mr. Parmar began to work part time at the Dunkin' Donuts restaurant on 82nd Street in Lindenwood. His father confirmed that Mr. Parmar worked 20+ hours per week, full time during summer break to save for college and contributed part of his pay to household expenses. Mr. Parmar said, "I didn't pay any mind to teasing or trying to fit in, changing myself to please anybody, I was focused on my studies…saving for college." Collateral sources characterized him as emotionally stable, kind and helpful, quiet in demeanor but very sociable. In hindsight, in light of the instant offenses, they recalled no errant conduct, no odd behaviors, nothing that warranted concern. "Literally nothing," Mr. Fischetti stated. Mr. Parmar continued to volunteer at the Sikh Cultural Society every few weeks, mainly preparing and serving food, and cleaning.

In the spring of 2011, Mr. Parmar was accepted for admission to City College of New York (CCNY). He graduated that June and that summer helped to pay for his and his mother's trip to a cousin's wedding in India, using $3,000 that he had saved expressly for this purpose. They spent most of the summer there.

That fall, Mr. Parmar began full-time classes at CCNY to study Business Management. Enrollment Verifications confirm full-time credits plus summer sessions for the first three years. Because he still commuted 90 minutes each way to school and continued to work, Mr. Parmar often scheduled all of his classes for two days and awoke at 6am for his 8am class. He studied in between classes, exercised at a gym on campus, and returned home late at night.

Early freshman year, Mr. Parmar left Dunkin' Donuts for work at a Verizon Wireless store; after two months, he took a better-paying job at the Brookstone store in Terminal 7 at John F.

Kennedy International Airport. His father confirmed that Mr. Parmar worked roughly 20 hours during the school year, 40 during the summer. Mr. Parmar said that outside of financial aid freshman year, he paid for his tuition, books and fees; bought his own clothes; continued to help his parents with expenses; and saved. Neither his father nor other collateral sources recalled financial mismanagement, risky behaviors, or other misconduct.

Mr. Parmar said that his social life largely consisted of study groups with classmates, and time with family. Mr. Parmar said that he did begin to drink alcohol during this period but drank only occasionally--"a few times a year"--and typically did not get drunk, though the fact of his drinking at all upset his parents.

Mr. Singh stated that in 2013, age 19-20, Mr. Parmar left Brookstone and began to drive the yellow cab under his supervision. Soon, Mr. Parmar also began to drive for Blue Lanes Car Service, in Howard Beach. Mr. Singh confirmed that Mr. Parmar drove two to five days per week, generally eight to twelve hours per shift, sometimes after school, and continued to save and to help with expenses. Sukhwant Sandhu, a childhood friend and the proprietor of SSS Transportation LLC, stated that Mr. Parmar also helped him run errands for SSS.

In September 2014, early in his last year at CCNY, just short of age 21, Mr. Parmar was in a major auto accident on the Belt Parkway. He said that he was returning from a dropoff for Blue Lanes when his brakes failed and he crashed into a tree. He underwent surgery at Brookdale Hospital, where a metal rod was implanted in his left femur. His entire left side was bruised and scraped, and he had pain from neck to toe, which still persists in lesser form. Because the prescribed painkillers made him nauseous, he went without and relief on heating pads and physical therapy. Mr. Parmar stated that he experienced significant stress and was likely depressed for a time.

It took nearly five months for Mr. Parmar to progress through wheelchair, crutches, and cane to unaided walking. During that time, he finished his semester from home via online classes from Oregon State University (OSU), from which he ultimately completed his credits. He did not return to the CCNY campus for classes.

As soon as he was physically able, in early 2015, Mr. Parmar obtained work as telemarketer/office assistant at an AllState insurance brokerage on Main Street in Flushing. He said that in March 2015, he left there to work as a driver for Hello Living, a Brooklyn-based residential real-estate developer. He worked there until that August, when he was laid off. Mr. Parmar quickly landed work as a project manager for Academy Fire Protection, which services commercial fire-sprinkler systems. "An alarm would go off at, like, Macys, and we'd respond. Ninety-nine percent of

the time it was a false alarm. I'd send a technician...We also did new constructions." He continued to drive the yellow cab and work form car services to save extra money.

Mr. Parmar stated that he completed his credits through OSU in Fall 2015 but did not immediately graduate due to a delay in the transfer of OSU credits. When his AllState job ended in late 2015/early 2016, he drove a yellow cab. He said that he wanted to save money to pursue a Master's degree.

In May 2016, Mr. Parmar received his Bachelor of Arts in Business Management.

## D. Offense Period through Instant Arrest

In August 2016, Mr. Harbir purchased a Toyota Highlander with the plan of making extra income as an Uber driver to speed his savings. He said that he put an $8,000 downpayment on a credit card. Mr. Singh said that later day, he accidentally left one of the car windows open after parking it, and Mr. Parmar "got upset...was drunk a little bit. I didn't see that before...My wife called the police." Mr. Parmar said that officers gave him the choice between arrest and a psychiatric evaluation, and he chose the latter. Mr. Singh confirmed that his son spent "one or two nights" in Jamaica Hospital and was discharged without a recommendation for further treatment.

Mr. Parmar began to drive for Uber. He said that between credit-card debt, auto insurance, and the accrual of gas and toll expenses, his credit-card debt quickly rose. "It was getting to like 10-15 thousand dollars," he recalled. "It's like I was working and working, and I wasn't getting anywhere."

That November, Mr. Parmar completed his Real Estate Salespersons 75-Hour Course through the New York Real Estate Institute. (Mr. Parmar provided the certificate.) That December, he accepted an offer to return to Hello Living, with the expectation that he would advance and earn a higher income given his licensure. Mr. Parmar resumed much the same routine there--driving and office work--and quickly became more dejected regarding his prospects and his growing debt despite working two jobs. He stated that he did not want to further burden his parents, and felt escalating pressure absent an apparent alternative stop the growth of his debt.

That December, Mr. Harbir began to commit the instant offense by overcharging Uber passengers. He stated that he rationalized his offense at the time with the logic that customers would ultimately receive refunds from the company, which he admittedly did not view as a victim. "It was mostly small amounts back then," he explained, "like $20, $50, $100." This continued throughout 2017 and into 2018 as he worked at Uber and at Hello Living. "It definitely wasn't the right thing to

do. I just didn't see any other way…I was working all the time, making like $2,000 a week driving, but my credit-card debt kept growing."

In his mounting anxiety, Mr. Harbir decided to purchase a residential-foreclosure property, renovate it into a proper rental, and possibly live there and build a real-estate business. He did little else during this period but work and return home. In April 2017, Mr. Parmar purchased a distressed three-family home in Springfield, Massachusetts. "It was the only thing I could afford," he stated. "I put all of my money into it--$30,000 cash plus a zero-interest loan from my credit-card…The taxes were low, a casino was opening…I figured it would take $60-80,000 to get it ready. I was going to use [credit cards] to do the repairs."

That summer, Mr. Harbir began to hire contractors, and to travel to Springfield to work on the property himself. "I was trying to build my experience," he said, "but at the same time I was losing track of my expenses because I was so busy, it just kept piling up. I didn't have time to sort through everything. Eventually it got to $40,000. Sukhwant Sandhu recalled,

> I knew he was in a tough spot when he bought the house…He had a contractor, but he got down and dirty himself…went there and worked with them…was involved as much as the contractors themselves. That house was his first big step towards a big achievement, "getting somewhere" in life…He had a college degree, but he was still driving a taxi…I don't think it was about status. I never got that at all. I think he didn't want anybody to feel sorry for him, or to look down on him. He wanted to make it work…do it himself.

This proved impossible, however, and Mr. Parmar asked his father for a loan to complete the renovations, which ran to roughly double what Mr. Parmar had projected. "I was sinking," he stated. Mr. Singh said that he ultimately loaned him approximately $150,000 and was unaware until after the arrest that Mr. Harbir also had accrued roughly $50,000 in credit-card debt. "He was going to pay me back when he made money," Mr. Singh recalled. The contractors were always wanting more. The house conditions [were] very bad inside and outside. It needed a roof. Everything…He was trying to make a new career. He was working very hard…I didn't know how bad it was."

Problems with the house--rising expenses, extended deadlines--mounted through 2017 as the 2018 date approached at which he would start to owe interest on the credit-card loan. "I was racing to beat the clock," he stated. "Hello Living was cutting my hours, Uber was slowing down, and the only way I had to make money was to drive… I didn't want to burden my parents anymore. I thought I needed to do this myself. I got myself into this mess, I thought I could handle everything somehow." Mr. Parmar continued to overcharge customers in kind.

Mr. Parmer said that by the time of the February 21-22, 2018, incident described in the Indictment and the Sealed Complaint, he was in a nearly constant state of quiet distress." I was overwhelmed. Not thinking right. I saw an opportunity to drive up the meter, then tell her she gave me the wrong address…It's the worst thing I've ever done. I thought I could make my payments for the month." That offense brought the cumulative overcharge to Uber customers to $3,600.

The next day, Mr. Parmar's Uber account was deactivated. He continued to drive for Lyft and Juno, and to work on the house. That March, he stopped working at Hello Living due to drastically reduced hours.

In late May 2018, Mr. Parmar's mother arranged a telephone introduction to Harpreet Bhatti, a family friend who lives in India and is a nurse, with the goal of marriage. He said that he and Ms. Bhatti talked several times over the next month and decided to get engaged. "I had a few short-term girlfriends, but never a serious relationship," he said. They got along well and scheduled the marriage for December 2018. The plan was to marry and then move into the Springfield house, "have a family, kids…start a life together."

On October 16, 2018, Mr. Harbir was arrested in the instant case. He was released on bail posted by his father.


E.    **Post-Arrest Conduct and Circumstances**

The following observations from persons close to Mr. Parmar and his family describe the aftermath of his arrest, both their reaction to news of the arrest and the impact of media coverage on Mr. Parmar and his family:

> Nobody from his house to 15 miles around would have thought this would happen to this kid. Never. It's just not in his nature…It was blasted all over the news. My friend sent him the screenshot, like, "This looks like *you*." No one believed it…Reporters were in front of their house for days…How many people can you have ask you about it? He was well-known in the community because he was always helping people out. Last year, when there was so much rain, he went around with a commercial water vacuum to help people drain out their sewers at the end of the driveways. Things like that.
>
> In the Indian community, there's shame…I recently had a house event, and no one in the family came. My daughter's first birthday in December, they couldn't come. My father-in-law passed away, they didn't come…It's the shame…He was a guy that would have a long conversation, but now he barely talks…I saw him at a wedding three months ago, and I didn't even recognize him. He's alone all the time now. People aren't as close to him like they were before.
>     - Sukhwant Sandhu

It totally shocked us. The only thing I can think of is the financial pressure. His friends had good jobs, he said he couldn't find job other than driving a taxi...and he wants to establish himself, to succeed... His mother has been very depressed. She feels disgraced...ashamed in the community. She is crying all the time. [the family's] dignity is hurt. Harry is the first person to get in any real trouble...I can tell you he's *very* regretful. I have a nine-year-old, and they would play video games together, and now [Mr. Parmar] is so depressed, he doesn't want to play anymore. You can see his face how regretful he is. He used to sit and chat when we visit, now doesn't want to look in your eyes.
  - Sarbjit Kaur

I never imagined what I heard on the news. My family, myself, everyone on the block. He was never that kid, like one day you're gonna hear something about him...The media was absolutely terrible. All day long hounding people asking for them to say anything...Cameras in front of house for hours and hours, and when the sun went down, the lights were on the house. They had to have the blinds down. Everybody felt it. It was really awful.
  - Joseph Fischetti

Harry has been very resilient. After the accident, he worked throughout the rehab, was trying to maintain a steady track to get himself in a successful position. He worked hard...When I say this is *completely* the opposite of where he'd end up, especially as a role model to his younger siblings, this is where I think he must have believed he didn't know where to turn to...like he'd exhausted all of his resources, his mental resources...He's always been so humble, especially about money...very conservative about it.

You have to understand that in the Sikh community, [among the] core values are selfless service to people who can't serve themselves, and maintain your reputation in society's eyes. If you bring dishonor to yourself, it brings dishonor to your entire family. That's an important part of this.
  - Karamveer Gill

The media has been very bad for us...They come to our house with video camera[s], everything. They knock the door, they stay outside...Our friends keep calling us, "What happened? What happened?" He's so quiet now. He doesn't want to talk to anybody about it. He seems depressed...I'm very concerned [about how it will affect the] family if he goes to prison.
  - Mr. Singh


Because he was not cleared to work until January, Mr. Parmar mostly worked on the house through February 2019, when the first tenants moved in. He attended all of his monthly Pretrial Services appointments, and submitted all negative toxicologies. As directed, Mr. Parmar also attended weekly individual psychotherapy sessions at First Light. He said that his therapist told him,

"'You catastrophize things...take these family burdens onto yourself.' Like I make it all my responsibility."

Through the HOPE Program, Mr. Parmar began training to coat roofs with white reflective paint that reduces heat retention. He stated that the program is designed to lead to full-time employment, and he also plans to obtain OSHA certifications in scaffolding and construction-site flagging. On May 17, through Sustainable South Bronx, Mr. Parmar completed the Adult CPR/AED course. (He provided a copy of the certification card.)

## III. Recommendation

Based on our investigation, we respectfully recommend that Mr. Parmar receive a non-custodial sentence. We believe that this is consistent with the case facts, his otherwise exemplary history, his condition and circumstances during the offense period, his conduct since his arrest, and his sincere remorse and efforts to resume a law-abiding, responsible life. Mr. Parmar does not appear to pose a threat to public safety, and we do not believe that he requires incarceration to deter him from future offenses. His arrest, the shame that he has brought his family, his public humiliation, and the lifelong burden of a felony conviction will serve that purpose.

A non-custodial sentence is consistent with 18 U.S.C. § 3553(a)—a sentence that is "sufficient, but *not greater than necessary*" (emphasis added) to comply with the purposes set forth in 3553(a)(2).

We thank the Court for its time and consideration in this matter.

Respectfully submitted,

*Chris Napierala*
Director

11

"'You catastrophize things…take these family burdens onto yourself.' Like I make it all my responsibility."

Through the HOPE Program, Mr. Parmar began training to coat roofs with white reflective paint that reduces heat retention. He stated that the program is designed to lead to full-time employment, and he also plans to obtain OSHA certifications in scaffolding and construction-site flagging. On May 17, through Sustainable South Bronx, Mr. Parmar completed the Adult CPR/AED course. (He provided a copy of the certification card.)

## III.    Recommendation

Based on our investigation, we respectfully recommend that Mr. Parmar receive a non-custodial sentence. We believe that this is consistent with the case facts, his otherwise exemplary history, his condition and circumstances during the offense period, his conduct since his arrest, and his sincere remorse and efforts to resume a law-abiding, responsible life. Mr. Parmar does not appear to pose a threat to public safety, and we do not believe that he requires incarceration to deter him from future offenses. His arrest, the shame that he has brought his family, his public humiliation, and the lifelong burden of a felony conviction will serve that purpose. Mr. Parmar's actions, crimes and bad judgment, reflect a young person's catastrophizing his financial debt and were motivated by a misguided attempt to deal with his self-perceived overwhelming debt obligations.

A non-custodial sentence is consistent with 18 U.S.C. § 3553(a)—a sentence that is "sufficient, but *not greater than necessary*" (emphasis added) to comply with the purposes set forth in 3553(a)(2).

We thank the Court for its time and consideration in this matter.

Respectfully submitted,

*Chris Napierala*
Director