**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

June 19, 2019

**BY ECF**
The Honorable Vincent L. Briccetti
United States District Judge
Southern District of New York
United States Courthouse
300 Quarropas Street
White Plains, New York 10601

      Re:    **United States v. Harbir Parmar**,
              18 Cr. 877 (VB)

Dear Judge Briccetti:

      The Government respectfully submits this letter in advance of the sentencing of defendant Harbir Parmar, which is currently scheduled for June 24, 2019.

      This is an exceptional case. The defendant's criminal conduct, while distinguishable from a typical kidnapping, is extremely troubling and has had a profound and serious impact on an individual victim ("Victim-1"). For that reason and the reasons explained below, the Government does not oppose a below-Guidelines sentence but urges the Court to impose a substantial and lengthy custodial sentence followed by a term of supervised release. A substantial custodial sentence—one that considers the nature and circumstances of the offense and reflects the seriousness of the defendant's conduct, promotes respect for the law, provides just punishment and affords adequate deterrence—will be "sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a)(2).

A.     **Offense Conduct**

As set forth in the Presentence Investigation Report (the "PSR"), starting as early as December 2016, the defendant, who worked as a driver for Uber, a ridesharing company, began overcharging his customers. (PSR ¶ 19.) Typically, the defendant accomplished this in two ways. One, the defendant dropped off his customers at their intended destinations but continued driving without ending their ride in the Uber mobile application (the "Uber Application")—essentially running up the meter and overcharging his customers. (PSR ¶ 19.) Two, the defendant falsely claimed that customers vomited in his vehicle in order to extract a cleaning fee from the customers and/or Uber. (PSR ¶ 20.)

Extending beyond his fraudulent conduct, on February 21, 2018, the defendant kidnapped Victim-1, one of his customers. (PSR ¶ 9-18.) Victim-1, a 31-year old female, ordered a vehicle through the Uber Application while she was in Midtown, Manhattan, and input her destination as her home address in White Plains, New York. (PSR ¶ 9.) At approximately 11:30 p.m., Victim-1 was picked up by the defendant in his vehicle. (PSR ¶ 9.)

Victim-1 fell asleep in the back of the defendant's vehicle. (PSR ¶ 10.) Shortly thereafter, the defendant changed Victim-1's destination in the Uber Application to a location in Massachusetts, knowing that Victim-1 did not intend to go there. (PSR ¶ 17.) Victim-1 later woke up to find the vehicle pulled over in a residential area and the defendant in the backseat of the vehicle with his hand under her shirt. (PSR ¶ 10.) The defendant was touching the top of Victim-1's breast. (PSR ¶ 10.) Victim-1 attempted to use her telephone to call for help, but the defendant grabbed the telephone away from her and refused to return it. (PSR ¶ 10.) The defendant then got back into the driver's seat and resumed driving. (PSR ¶ 11.)

Victim-1 pled with the defendant to be taken back to White Plains or to a police station, but the defendant refused. (PSR ¶ 11.) Instead, the defendant dropped Victim-1 off on the side of the highway near a gas station. (PSR ¶ 12.) By the time Victim-1 escaped the vehicle, it was approximately 2:00 a.m. and she was in Branford, Connecticut—over 60 miles away from her home. (PSR ¶ 13.)

After dropping off Victim-1, the defendant proceeded to Massachusetts and completed the Uber ride as noted, charging Victim-1 $1,047.55 for the trip. (PSR ¶ 14.) The defendant also submitted to Uber photographs of what he claimed to be Victim-1's vomit in an effort to extract a cleaning fee from Victim-1 as well. (PSR ¶ 20.)

**B.     The Defendant's Guilty Plea and the PSR**

On March 11, 2019, the defendant pleaded guilty to kidnapping, in violation of Title 18, United States Code, Section 1201(a) and to wire fraud, in violation of Title 18, United States Code, Section 1343. (PSR ¶ 5.) Pursuant to the Plea Agreement, the parties stipulated that the United States Sentencing Guidelines ("Guidelines") range is 87 to 108 months' imprisonment, based on offense level 29 and Criminal History Category I. (PSR ¶ 4.) This is consistent with the Guidelines range as calculated by the United States Probation Office (the "Probation Office") in the PSR.

During the defendant's plea allocution, the defendant admitted to changing Victim-1's destination in the Uber Application after Victim-1 "passed out" in the back of his vehicle. (Plea Tr. at 33.) The defendant stated that his intention was "to run up the fare," and he admitted to changing the destination in a way that made it look like Victim-1 had made a mistake. (Plea Tr. at 33.) The defendant also admitted to overcharging other customers on a number of occasions, both by running up the fares and falsely claiming a cleaning fee. (Plea Tr. at 35.)

In the PSR, the Probation Office recommended a sentence, principally, of 60 months' imprisonment. (PSR Sentencing Recommendation at 22.) In recommending this prison sentence, the Probation Office emphasized, among other things, that the kidnapping represented an "escalation of [the defendant's] conduct." (*Id.* at 23.)

C.   Discussion

   1.   Applicable Law

Section 3553(a) of Title 18, United States Code, provides that the sentencing court "shall impose a sentence sufficient but not greater than necessary, to comply with the purposes" of sentencing outlined in Section 3553(a)(2). Section 3553(a) then sets forth specific considerations, including: the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; the defendant's need for rehabilitation; the kinds of sentences available; the need to avoid unwarranted disparities in the sentences imposed on similarly situated defendants, and the sentencing range under the Guidelines. 18 U.S.C. § 3553(a).

Although no longer mandatory, the Guidelines continue to be an important sentencing factor. Indeed, because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall* v. *United States*, 552 U.S. 38, 46 (2007), the Supreme Court has instructed that the Guidelines are the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 49; *see also United States* v. *Rattoballi*, 452 F.3d 127, 133 (2d Cir. 2006) (the Guidelines "'cannot be called just 'another factor' in the statutory list, 18 U.S.C. § 3553(a), because they are the only integration of the

4

multiple factors and, with important exceptions, their calculations were based upon the actual sentences of many judges.'"). After making the initial Guidelines calculation, a sentencing judge must then consider the other factors outlined in Title 18, United States Code, Section 3553(a), and impose a sentence that complies with the purposes of sentencing.

### 2. The Government's Sentencing Recommendation

The Government recognizes that the instant kidnapping differs from a typical kidnapping and thus does not oppose a sentence below the Guidelines range of 87 to 108 months' imprisonment. The Government does not, however, believe that the circumstances here favor judicial leniency. Instead, the Government believes that the Guidelines range of 87 to 108 months' provides a useful initial benchmark and that the Guidelines and the Section 3553(a) factors require a substantial term of imprisonment that fully reflects the severity of the defendant's criminal conduct. In particular, the nature and circumstances of the offense are alarming and a significant prison sentence is necessary to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and afford adequate deterrence to the defendant and others. *See* 18 U.S.C. § 3553(a)(1), (2)(A), (2)(B), (2)(C).

### i. The Nature and Circumstances of the Offense

The nature and circumstances of this offense—arguably the most important factor to be considered under Section 3553(a)—require a lengthy term of imprisonment. In fact, each detail of the offense reveals the callousness and dangerousness of the defendant's conduct.

*First*, the defendant terrorized Victim-1. Victim-1 wanted to travel approximately 30 miles, but instead the defendant planned to drive her more than 200 miles in the middle of the night without her knowing. (PSR ¶ 9, 17.) Victim-1 awoke with the vehicle parked in an unknown residential area and with the defendant in the backseat leaning over her with his hand on her breast.

(PSR ¶ 10.)  The defendant took Victim-1's cellphone from her hand and refused to return it.  (PSR ¶ 10.)  The defendant then got back in the driver's seat and continued to drive Victim-1 toward Boston despite her pleas for him to take her to White Plains.  (PSR ¶ 11.)  Eventually, the defendant did allow Victim-1 to leave the vehicle, and she was dropped off on the side of the highway, in Branford, Connecticut at approximately 2:00 a.m., with no idea where she was and no telephone to use to call for help.  (PSR ¶ 10-12.)  As made clear in the Victim Impact Statement[1] submitted to the Court, this traumatizing experience has had lasting and devastating effects on Victim-1's life.

*Second*, the defendant targeted a vulnerable individual to be the victim for his crime.  As described above, after several months of fraudulently overcharging Uber customers, the defendant decided to kidnap one of his customers to extract an even larger fare than he was able to obtain through his ordinary fraud.  The customer he chose, Victim-1, was a young Japanese woman with limited English proficiency, who was intoxicated and travelling alone at night.  Moreover, by taking her telephone away from her, the defendant further ensured Victim-1's defenselessness.

*Third,* recognizing that Uber would not let him keep the large fare if it knew he obtained it by fraud, the defendant meticulously covered up his crime by concocting a story where Victim-1 was an unruly and intoxicated customer who had requested a ride to Boston and then reneged.  After Victim-1 fell asleep in his vehicle, the defendant changed her destination in the Uber Application to a destination with nearly the same street name as her home address located in Boston, Massachusetts.  The defendant admitted at his plea to doing this so that he could drop Victim-1 off in Boston several hours later and convince her that she had entered the wrong address into the Uber Application.  (Plea Tr. at 33.)  The fake photographs of vomit that the defendant sent

---

[1] Victim-1 submitted a Victim Impact Statement to the Court on June 10, 2019 and requested that the letter, Victim-1's name and any personal identifying information remain under seal.  The Government joins in this request.

Uber were also intended to hide his guilt and instead lay blame on Victim-1. The defendant even went so far as to make a contemporaneous audio recording on his phone in the middle of the kidnapping during which he repeatedly referred to Victim-1 being intoxicated. The defendant played this recording for law enforcement during an interview in an effort to bolster his story before realizing that the recording did more to incriminate him than to reflect the intoxication of Victim-1.[2]

        **ii.**        **Reflecting the Seriousness of the Offense, Promoting Respect for the Law and Providing Just Punishment**

A substantial custodial sentence also is needed "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). Even though this kidnapping may not be the type of conduct envisioned by the Sentencing Commission when the kidnapping guidelines were established, this does not diminish the seriousness of the conduct. In fact, the seriousness of the defendant's conduct and the degree of the defendant's indignities cannot be overstated—the defendant took a vulnerable woman hours away from her home against her will, inappropriately touched her while she was sleeping, recklessly dropped her off in an unknown location in the middle of the night on the side of the highway without a telephone, and then had the audacity to make her pay financially for his criminal conduct.

The fact that the defendant's motivation was in part financial in no way mitigates the seriousness of his conduct. *First*, the kidnapping statute makes clear that the purpose of a kidnapping is irrelevant. *See* 18 U.S.C. § 1201(a) ("Whoever unlawfully . . . kidnaps . . .for ransom, reward *or otherwise* . . .") (emphasis added). Even so, the reasons enumerated in the statute–

---

[2] Specifically, Victim-1 can be heard on the defendant's audio recording asking the defendant why he was touching her when she woke up. This corroborates Victim-1's allegations of sexual misconduct.

7

ransom or reward—specifically envision an intent of financial gain. There is no principled distinction between kidnapping someone to run up a cab fare and kidnapping someone to seek ransom. In both instances, a criminal creates a dangerous situation by taking a victim against their will in an effort to obtain money. Additionally, the defendant's motivation is meaningless from the perspective of Victim-1. This experience traumatized Victim-1 just as any other violent crime would. Being refunded the money she was charged does nothing to dampen the anguish Victim-1 has experienced as a result of the defendant's actions.

### iii. Affording Adequate Deterrence

A lengthy term of imprisonment also is required to "protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(C). The defense submission would have the Court believe that the defendant no longer poses a risk to the public because he is remorseful and has already been adequately deterred through the shame his arrest has brought on himself and his family. However, the picture painted of the defendant as a remorseful young adult who took this aberrant action out of financial desperation is inconsistent with the facts and the true characteristics of the defendant.

While it is true that the defendant does not have any criminal history, it is inaccurate to characterize this criminal conduct as a momentary lapse in judgment. In fact, the defendant spent over a year continually cheating his customers, and when he grew frustrated with the returns he got through his fraud, he escalated his conduct to kidnapping. With complete disregard for how his conduct would impact another human being, the defendant terrorized a young woman in hopes of making some quick money and harassed her in the process. Additionally, as described above, elements of the kidnapping itself were carefully crafted and executed.

The defendant's remorsefulness is also dubious. In committing this crime, the defendant was perfectly willing to horrify Victim-1 and then convince her that she had only herself to blame.

Moreover, in conversations with law enforcement, the defendant continually justified his conduct—including trying to drive her Boston even though he knew she wanted to go to White Plains—by denigrating Victim-1 for being intoxicated.  Specifically, when law enforcement officers asked the defendant about a hypothetical situation where an Uber driver took his mother or sister out of the state against their permission, the defendant responded: "they don't drink."  The defendant claims before this Court that he is remorseful, but in speaking with law enforcement, even after he had been caught, he still saw Victim-1 as deserving of this treatment.  Because the defendant has not fully accepted responsibility for his actions, a substantial custodial prison is needed to adequately deter him from engaging in similar conduct in the future.

A substantial custodial sentence also is required "to afford adequate deterrence to criminal conduct" by others.  18 U.S.C. § 3553(a)(2)(B).  Deterring others from engaging in this conduct is critical because with the development of ridesharing services like Uber, new drivers have flooded the market, leading to more cab rides and more opportunities for exploitation of young women and other vulnerable individuals.  Moreover, the crimes committed by the defendant—the wire fraud, and even the kidnapping—are not difficult ones for others to commit.  The sentence the defendant receives should send a message to others that if they engage in similar conduct, they will face substantial punishment.

        3.        **The Defense Submission**

The defense submission requests a non-custodial sentence.  (Def. Mem. at 1.)  As set forth in the PSR, however, the Guidelines do not authorize a term of probation for individuals at the defendant's offense level.  *See* U.S.S.G. § 5B1.1, App. Note 2 ("Where the applicable guideline range is in Zone C or D of the Sentencing Table . . . the guidelines do not authorize a sentence of probation.").  Accordingly, the defendant's request for a non-custodial sentence is flatly at odds

with the guidelines of the Sentencing Commission. Even if a sentence of probation were authorized, it would be utterly inappropriate for this defendant.

In support of its position, the defense submission relies heavily on details of the defendant's upbringing and the financial situation. This comprehensive recounting serves only to make the defendant's conduct seem more inexcusable. Unlike many people who appear before the Court for sentencing, the defendant grew up in an intact home with two parents and two siblings, and had plentiful educational and professional opportunities. (Def. Mem. at 2-7.) The defendant claims through his submission that he was in debt at the time he committed these crimes, but he also states that he was earning approximately $2,000 per week driving for ridesharing companies, had a second job and obtained a $150,000 loan from his father. (Def. Mem. at 8.) These circumstances do not justify, explain or even make sense of the escalating and violent conduct of the defendant.

Notably, and perhaps unsurprisingly, the defense submission also makes no mention at all of nature and circumstances of the offense. Strikingly, Exhibit A to the defense submission lists the sources on which the submission is based and absent from that list is any discovery provided in this case or any other source of information that pertains to the offense conduct. As a result, what the submission amounts to is not an argument for why a non-custodial sentence is sufficient in this instance, but rather a cataloging of the minutiae of the defendant's life that does nothing to mitigate the defendant's criminal conduct.

**D.   Conclusion**

For the foregoing reasons, the Government respectfully requests that the Court impose a substantial custodial sentence followed by a term of supervised release.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By:   /s/
Jamie Bagliebter
Assistant United States Attorney
Southern District of New York
(914) 993-1933

cc:   Arthur Aidala, Esq. (via ECF)